**FILED**

# UNITED STATES DISTRICT COURT
### for the

Eastern District of California

MAR 2 5 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
              DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | |
| Johnny TORRES, Donovan TORRES, | ) | **2: 1 4 - MJ - 7 1    DAD** |
| Sally EVANS, Melissa Monique TORRES, | ) | |
| Jorge MAGANA | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   January 15th through March 14, 2014   in the county of   San Joaquin   in the

Eastern   District of   California   , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|

Johnny TORRES and Donovan TORRES
18 U.S.C. § 922(a)(1)(A) dealing firearms without a license, and conspiracy,
18 U.S.C. § 371 conspiracy to deal firearms without a license
Sally EVANS
21 U.S.C. §§ 846 & 841(a)(1), conspiracy to distribute methamphetamine and distribution of at least 50 grams of a mixture or substance containing methamphetamine
Melissa Monique TORRES
21 U.S.C. §§ 846 & 841(a)(1), conspiracy to distribute methamphetamine and distribution of at least 50 grams of a mixture or substance containing methamphetamine
18 U.S.C. § 371 conspiracy to deal firearms without a license
Jorge MAGANA
21 U.S.C. §§ 846 & 841(a)(1), conspiracy to distribute methamphetamine and distribution of at least 50 grams of a mixture or substance containing methamphetamine

This criminal complaint is based on these facts:

(see attachment)

☒   Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Thomas Keen Bureau of Alcohol, Tobacco,
Firearms and Explosives
*Printed name and title*

Sworn to before me and signed in my presence.

Date:      March 17, 2014

_____
*Judge's signature*

City and state:    Sacramento, California

Dale A. Drozd, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT AND CRIMINAL COMPLAINT

I, Thomas Keen, being duly sworn, do hereby declare and state the following:

### BACKGROUND & EXPERTISE

1.      I am a Special Agent ("SA") employed with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Justice Department, and have been so employed since September 18, 2012. I successfully completed the Criminal Investigations Training Program at the Federal Law Enforcement Training Center, Brunswick, Georgia and the ATF Special Agent Basic Training National Training Academy also conducted in Brunswick, Georgia. During these courses of study, I received training in the investigation of Federal Alcohol, Tobacco, Firearms and Explosives violations. Previous to my employment as a Special Agent, I was employed as a Police Officer by the City of Southlake Police Department, in the Great State of Texas, for approximately 11 years. During my employment with ATF, I have conducted or participated in investigations related to the possession and manufacture of firearms in violation of Titles 18 and 26 of the United States Code as well as the possession and distribution of controlled substances in violation of Title 21 of the United States Code. Based on such investigations, as well as my training and experience and discussions with other law enforcement personnel, I have become familiar with the methods used by firearms and/or narcotics traffickers to smuggle, safeguard and store firearms and/or narcotics as well as the proceeds of such activities.

2.      The facts set forth in this affidavit are based upon my personal observations and investigation, my training and experience, and information obtained through conversations I have had with other law enforcement agents and officers with knowledge about this case. This affidavit is made for the sole purpose of demonstrating probable cause for the issuance of this search warrant and does not purport to set forth all of my knowledge of this investigation.

1

## SCOPE OF REQUESTED CRIMINAL COMPLAINT & SEARCH WARRANT

3.       This Affidavit is submitted in support of a Criminal Complaint charging JOHNNY

TORRES, DONOVAN TORRES, Sally EVANS, Melissa TORRES, and Jorge MAGANA with

the following crimes:

- a.  JOHNNY TORRES with dealing firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A), and conspiracy, in violation of 18 U.S.C. § 371, on January 15, 2014 and February 20, 2014;

- b.  DONOVAN TORRES with dealing firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A), and conspiracy, in violation of 18 U.S.C. § 371, on January 15, 2014, January 31, 2014, and February 13, 2014;

- c.  Sally EVANS with conspiracy to distribute methamphetamine and distribution of at least 50 grams of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. §§ 846 & 841(a)(1), on February 11, 2014, February 13, 2014, February 20, 2014, March 13, 2014, and March 14, 2014;

- d.  Melissa Monique TORRES with conspiracy to distribute methamphetamine and distribution of at least 50 grams of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. §§ 846 & 841(a)(1), on January 31, 2014, February 11, 2014, and March 14, 2014,  and with conspiracy to deal firearms without a license, in violation of 18 U.S.C. § 371, on January 15, 2014; and

- e.  Jorge MAGANA with conspiracy to distribute methamphetamine and distribution of at least 50 grams of a mixture or substance containing methamphetamine, in violation of in violation of 21 U.S.C. §§ 846 & 841(a)(1), on January 31, 2014, February 11, 2014, February 20, 2014, and March 14, 2014.

4.       This affidavit also is submitted in support of a warrant to search the following locations:

- a.  The current residence of EVANS and Melissa TORRES, located at **1217 N. Wilson Way, Stockton, California** (described in detail in Attachment A-1) for the items described in Attachment B-1;

- b.  The current residence of MAGANA, located at **4660 Ijams Street, Stockton, California** (described in detail in Attachment A-2) for the items described in Attachment B-2;

2

c.  The suspected "stash pad" of MAGANA located at **5345 Barbados Circle, Stockton, California** (described in detail in Attachment A-3) for the items described in Attachment B-3;

d.  All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person; including, but not limited to the following:

> i.  A white Hyundai 4-door sedan with California license plate 6ZPB871, registered to Sally Elizabeth Evans at 546 E. Alpine Avenue, Stockton, California, 95204; and
>
> ii.  A white Cadillac Escalade with California license plate 7BRK878, registered to Daniel Bennett at 340 Blain Avenue, Stockton, California, 95204.

## FACTS ESTABLISHING PROBABLE CAUSE

### BACKGROUND OF THE INVESTIGATION

5.  On January 8, 2014, ATF SA Ricky Chan and I conducted surveillance on **1217 N. Wilson Way**. I had received information from a reliable confidential source that two residents of the house were selling firearms and methamphetamine out of **1217 N. Wilson Way**. While conducting surveillance on January 8, 2014, I observed a white Hyundai 4-door sedan bearing California license plate #6ZPB871 parked out in front of the residence at **1217 N. Wilson Way**. A vehicle query identified the registered owner as a Sally EVANS.

3

## JANUARY 15, 2014 PURCHASE OF THREE FIREARMS FROM JOHNNY TORRES, DONOVAN TORRES, AND MELISSA TORRES

6. On January 15, 2014, ATF SA Tim Watkins, acting in an undercover capacity, traveled to **1217 N. Wilson Way** to conduct a previously scheduled purchase of three firearms. Law enforcement surveillance units in close proximity to **1217 N. Wilson Way** electronically monitored the transaction.

7. Upon arrival, SA Watkins contacted a white adult female, later identified as MELISSA TORRES, and entered the residence. SA Watkins then met a Hispanic male who introduced himself as "Fat Boy" (later identified as JOHNNY Michael Costilla TORRES).[1] SA Watkins and JOHNNY TORRES discussed a transaction involving three firearms, and then JOHNNY TORRES sold SA Watkins three firearms for $1,200.00 in pre-recorded U.S. currency. After accepting the money, JOHNNY TORRES asked SA Watkins if he would pay MELISSA TORRES $100.00 for arranging the transaction. SA Watkins handed JOHNNY TORRES an additional $100.00 to compensate MELISSA TORRES for arranging the transaction. SA Watkins also observed a second Hispanic male (later identified as DONOVAN TORRES) inside the residence. After the sale, DONOVAN TORRES provided SA Watkins with two firearm cases to transport the three firearms he had just purchased.

8. An ATF agent later determined that the three firearms purchased consisted of: a Ruger .22 caliber pistol, model Mark 1, serial number 275975; a Hi-Point 9mm pistol, model C, serial number P037975; and a KEL-TEC 9mm pistol, model P11, serial number AHZ82.

9. Additionally, an ATF expert determined that DONOVAN TORRES, JOHNNY TORRES, and MELISSA TORRES all lacked a license to sell firearms.

---

[1] On February 4, 2014, SA Watkins positively identified Johnny Michael Costilla TORRES

4

JANUARY 31, 2014 PURCHASE OF ONE FIREARM AND TWO OUNCES OF METH

Meth Sale Involving Melissa Torres and Magana

10.     On January 31, 2014, SA Tim Watkins, acting in an undercover capacity, traveled to

**1217 N. Wilson Way** to conduct a previously scheduled transaction to purchase a firearm and

crystal methamphetamine. Surveillance units comprised of ATF Agents and Task Force Officers

were in the vicinity monitoring the transactions via electronic monitoring equipment.

11.     Upon arrival, at approximately 4:19 p.m., SA Watkins exited the vehicle he had arrived

in and made contact with MELISSA TORRES. SA Watkins then entered **1217 N. Wilson Way**.

12.     At approximately 4:30 p.m., law enforcement surveillance units observed a white

Cadillac Escalade, bearing California license plate 7BRK878, park in an alley just north of **1217

N. Wilson Way**. A heavy-set Hispanic male with corn row style hair (later identified as Jorge

MAGANA) exited the vehicle and entered **1217 N. Wilson Way**.[2]

13.     MELISSA TORRES asked SA Watkins for the money to pay for the two ounces of

suspected crystal methamphetamine Watkins would purchase. MELISSA TORRES told SA

Watkins that the person delivering the methamphetamine was her roommate's friend and that her

roommate did not want SA Watkins meeting the man delivering the drugs. MELISSA TORRES

also told SA Watkins that her roommate was concerned about SA Watkins and MAGANA

cutting her out of future drug deals. SA Watkins told MELISSA TORRES that he would need to

see the methamphetamine before paying for it. SA Watkins followed MELISSA TORRES into

the front room of the residence. SA Watkins observed MAGANA talking on his cellular phone.

SA Watkins also saw JOHNNY TORRES (aka "Fat Boy") in the front room with MAGANA.

---

[2] On February 13, 2014, investigating law enforcement officials positively identified Jorge MAGANA as the individual who sold SA Watkins two ounces of suspected methamphetamine on January 31, 2014.

5

14.     MELISSA TORRES handed SA Watkins two clear plastic baggies containing suspected

methamphetamine. MAGANA apologized to SA Watkins for being late. SA Watkins handed

MAGANA $900.00 in pre-recorded U.S. currency. MAGANA handed the money to MELISSA

TORRES. She counted the money, advised SA Watkins that the methamphetamine was $500.00

per ounce, and handed the $900.00 to MAGANA. SA Watkins then handed MELISSA

TORRES an additional $100.00 in pre-recorded U.S. currency as payment for brokering the

transaction. At that point, SA Watkins observed MAGANA exit the residence. Law

enforcement surveillance units observed MAGANA enter the driver's seat of the white Cadillac

Escalade and depart **1217 N. Wilson Way** traveling southbound on N. Wilson Way.

15.     During a subsequent field test, the suspected crystal methamphetamine tested positive for

methamphetamine.

Firearm Sale Involving Donovan Torres, Johnny Torres, and Melissa Torres

16.     SA Watkins and JOHNNY TORRES then entered another room in the **1217 N. Wilson

Way** residence and began discussing a firearm transaction. JOHNNY TORRES advised SA

Watkins that the firearm he would sell was his brother's firearm, and that they were waiting on

his brother to arrive.

17.     At approximately 4:47 p.m., surveillance units observed a pearl white Lincoln LS stop at

the intersection of N. Wilson Way and Pinchot Street. Surveillance units observed a Hispanic

male (later identified as DONOVAN TORRES) carrying a black plastic case exit from the

passenger side of the vehicle and enter the target residence through the front door.[3]   At

---

[3] At the time of the transaction, on January 31, 2014, SA Watkins recognized the subject to be the same Hispanic male present with Fat Boy on January 15, 2014 when SA Watkins purchased three firearms. At that time, he did not know that the subject was DONOVAN TORRES. On February 19, 2014, SA Watkins positively identified DONOVAN Gene TORRES as the individual who sold him one firearm on January 31, 2014 and one firearm on February 13, 2014.

6

approximately 4:48 p.m., SA Watkins observed DONOVAN TORRES enter the residence holding a black plastic case.

18.     DONOVAN TORRES walked up to SA Watkins and opened the case. SA Watkins observed that the case contained one firearm and two high capacity firearm magazines. SA Watkins observed that each magazine was loaded with 9mm caliber rounds of ammunition.

19.     SA Watkins and DONOVAN TORRES negotiated a price for the firearm. DONOVAN TORRES advised SA Watkins that he wanted $1,350.00 for the firearm and SA Watkins agreed to the price. SA Watkins then paid DONOVAN TORRES $1,350.00 of pre-recorded U.S. currency for the firearm. At that point, MELISSA TORRES indicated to DONOVAN TORRES that she wanted to be compensated for arranging the transaction. DONOVAN TORRES asked SA Watkins for an additional $50.00 to pay MELISSA TORRES, and SA Watkins handed him an additional $50.00 in pre-recorded US currency.

20.     An ATF agent later determined that the purchased firearm was a Masterpiece Arms pistol, 9mm caliber, model MPA30, serial number B9891.

    FEBRUARY 11, 2014 PURCHASE OF ONE FIREARM AND FOUR OUNCES OF METH

Firearm and Meth Sale Involving Evans and Melissa Torres

21.     On February 11, 2014, SA Watkins and Task Force Officer ("TFO") Glenn Hanker, both acting in an undercover capacity, traveled to **1217 N. Wilson Way** to meet with individuals regarding a previously arranged transaction to purchase a firearm and crystal methamphetamine. Law enforcement surveillance units set up near **1217 N. Wilson Way** to electronically monitor the transaction.

22.     Upon arrival, at approximately 3:54 p.m., SA Watkins and TFO Hanker made contact with Sally EVANS at the front door of **1217 N. Wilson Way**. SA Watkins and TFO Hanker

7

then entered the residence. SA Watkins observed MELISSA TORRES sitting on a couch in the front area of the house. He then saw her remove a blanket from the couch and under the blanket he saw a plastic bag that contained a white substance resembling crystal methamphetamine. SA Watkins picked up the plastic bag and examined its contents.

23.     MELISSA TORRES then grabbed a white t-shirt from behind the couch. TFO Hanker observed MELISSA TORRES remove a firearm from the white t-shirt. MELISSA TORRES placed the firearm on the couch next to her.

24.     SA Watkins and MELISSA TORRES negotiated the price for the firearm. MELISSA TORRES advised SA Watkins that the price was $700.00 and said to SA Watkins, "That's what he's asking," referring to the price. SA Watkins again asked MELISSA TORRES about the price of the firearm and she replied that $600.00 was the lowest price for the gun.

25.     Then, SA Watkins and EVANS negotiated a price for the suspected methamphetamine. SA Watkins placed $2,000.00 of pre-recorded US currency on the couch and asked EVANS about future prices. EVANS took possession of the money that SA Watkins placed on the couch.

26.     SA Watkins paid MELISSA TORRES $600.00 for the firearm and $60.00 for brokering the transaction. This money was also pre-recorded U.S. currency. MELISSA TORRES took possession of the money.

27.     ATF agents identified the firearm as a Walther P22, semi-automatic, .22 caliber handgun.

28.     At approximately 4:01 p.m., SA Watkins and TFO Hanker departed the residence. SA Watkins departed with the firearm he purchased from MELISSA TORRES and the suspected methamphetamine he purchased from EVANS. During a subsequent field test, the suspected crystal methamphetamine tested positive for methamphetamine.

8

February 11th Surveillance Tying Magana to the February 11th Meth Sale

29.     After the transaction at **1217 N. Wilson Way**, law enforcement surveillance units observed EVANS exit the residence, walk southbound on N. Wilson Way, and enter Smokey's Smoke Shop, located at 1069 N. Wilson Way.

30.     At approximately 4:17 p.m., law enforcement surveillance units observed a white Cadillac Escalade bearing California license plate 7BRK787 (the Cadillac driven by MAGANA during the January 31, 2014 transaction) pull up in front of the Smoke Shop. Surveillance units observed EVANS exit the Smoke Shop and enter the front passenger seat of the Cadillac Escalade. Surveillance unit's maintained mobile surveillance as the vehicle departed the location.

31.     At approximately 4:19 p.m., surveillance units observed the Cadillac pull to the side of the roadway on Sierra Nevada Street facing northbound. Law enforcement drove by the vehicle and observed MAGANA in the driver's seat holding a handful of money in his left hand and EVANS seated in the front passenger seat. Based on my training and experience, law enforcement surveillance on February 11, 2014, and the fact that EVANS met with MAGANA directly after the methamphetamine sale, I believe that EVANS handed over the proceeds of the methamphetamine transaction to MAGANA.

February 11th and 12th Surveillance Tying Magana to 4660 Ijams Street

32.     Law enforcement surveillance units following MAGANA from his meeting with EVANS to the residence at **4660 Ijams Street, Stockton, California**, where MAGANA exited the vehicle and entered the residence on the afternoon of February 11, 2014 shortly after 4:30 p.m. Mobile surveillance maintained constant surveillance on MAGANA's Cadillac from his meeting with EVANS until he arrived at **4660 Ijams Street**.

9

33. The next morning, February 12, 2014, at approximately 7:40 a.m., law enforcement surveillance drove by **4660 Ijams Street** and saw that the Cadillac Escalade was still parked in the driveway.

34. In addition, law enforcement officials working with ATF confirmed via the Lexus Nexus Accurint Law Enforcement database that **4660 Ijams Street** is MAGANA's residence.

FEBRUARY 13, 2014 PURCHASE OF ONE FIREARM AND FOUR OUNCES OF METH

35. On February 13, 2014, SA Watkins and TFO Hanker, both acting in an undercover capacity, traveled to **1217 N. Wilson Way** to meet with individuals regarding a previously scheduled transaction to purchase a firearm and crystal methamphetamine. Law enforcement surveillance units set up electronic surveillance outside of **1217 N. Wilson Way** in order to electronically monitor the transaction.

36. SA Watkins and TFO Hanker arrived at the residence at approximately 4:21 p.m. After exiting their vehicle, they made contact with EVANS at the front door. At the same time, DONOVAN TORRES arrived at the front door. SA Watkins, TFO Hanker, and DONOVAN TORRES entered the residence.

Firearm Sale Involving Donovan Torres and Melissa Torres

37. SA Watkins and DONOVAN TORRES engaged in conversation regarding the purchase of a firearm. DONOVAN TORRES walked to another part of the house and returned a short time later in possession of a rifle. DONOVAN TORRES handed SA Watkins the rifle and stated that it's (referring to the rifle) brand new and out of the box with no scratches. SA Watkins and DONOVAN TORRES negotiated a price for the rifle. DONOVAN TORRES said that he could lower the price to $1,600.00. SA Watkins agreed on the price and asked DONOVAN TORRES if

10

he had a blanket to wrap the weapon in. DONOVAN TORRES advised that he had just walked from Harding Way with the rifle concealed in his pants.

38.     SA Watkins handed DONOVAN TORRES $1,600.00 in pre-recorded U.S. currency for the rifle. DONOVAN TORRES accepted the money and walked away.

39.     At this time, EVANS advised SA Watkins and TFO Hanker to come into another room where she was located. EVANS told MELISSA TORRES, who was also present in the room, to grab a blanket to conceal the rifle for SA Watkins. MELISSA TORRES returned to the room a short time later with a blanket.

40.     The purchased firearm was subsequently identified by an ATF agent as an Izhmash Russian-style .223 caliber rifle, model Saiga, with serial number H09161335.

Meth Sale Involving Evans

41.     After entering the residence, EVANS asked SA Watkins how much methamphetamine he wanted and SA Watkins said that he wanted four ounces. EVANS walked away from the area and made a call on her cellular phone.

42.     Approximately fifteen minutes later, EVANS told SA Watkins and TFO Hanker that she was going outside to get it (referring to the methamphetamine). At approximately 5:21 p.m., law enforcement conducting surveillance observed EVANS exit the front door of **1217 N. Wilson Way** while talking on a cellular phone. At approximately 5:24 p.m., law enforcement surveillance observed a green Suzuki 4-door sedan bearing California license plate 5HEZ973 pull up in front of **1217 N. Wilson Way**. Law enforcement surveillance units observed EVANS take possession of an unknown white object from one of the vehicle's occupants and then re-enter the residence.

11

43.     EVANS rejoined SA Watkins and TFO Hanker in the house carrying a white paper bag. EVANS opened the paper bag and removed a plastic bag containing a white substance resembling crystal methamphetamine. SA Watkins asked EVANS if the methamphetamine was from the same source as the last transaction. EVANS said that it was from a different person. SA Watkins handed EVANS $1,900.00 in pre-recorded U.S. currency for the white paper bag that contained the suspected methamphetamine. EVANS took possession of the money and counted it in front of SA Watkins and TFO Hanker.

44.     SA Watkins asked EVANS if she is good with the money and indicated that he did not want her to set up the meth transactions for free. EVANS stated that this source was cheaper than the previous person, and that she was good with the payment. SA Watkins handed TFO Hanker the paper bag containing the suspected methamphetamine.

45.     EVANS departed the residence and entered the green Suzuki that was still parked outside. Law enforcement surveillance observed the Suzuki depart the location traveling southbound on N. Wilson Way. The suspected methamphetamine subsequently was field tested and returned a presumptively positive test result for methamphetamine.

FEBRUARY 20, 2014 PURCHASE OF TWO FIREARMS AND FOUR OUNCES OF METH

46.     On February 20, 2014, SA Watkins and TFO Hanker, both acting in an undercover capacity, traveled to **1217 N. Wilson Way** to conduct a previously scheduled transaction involving the purchase of firearms and suspected crystal methamphetamine. Law enforcement surveillance units were located nearby to electronically monitor the transaction.

47.     Meanwhile, at approximately 11:45 a.m., law enforcement surveillance located near **4660 Ijams Street** observed the white Cadillac Escalade bearing California license plate 7BRK878 parked in the driveway. Stockton Police Department Detective Huff – conducting surveillance –

12

observed MAGANA in the Cadillac. This is the Cadillac that law enforcement had seen

MAGANA drive on January 31, 2014 and February 11, 2014 and that law enforcement had seen

parked in the driveway of **4660 Ijams Street** early in the morning on February 12, 2014,

presumably overnight.

48.     At approximately 12:01 p.m., SA Watkins and TFO Hanker arrived at **1217 N. Wilson**

**Way**. Upon arrival, SA Watkins and TFO Hanker made contact with MELISSA TORRES at the

front door of the residence. MELISSA TORRES allowed SA Watkins and TFO Hanker to enter

the house.

49.     Upon entering, SA Watkins saw JOHNNY TORRES, EVANS, and an unidentified

Hispanic male inside the front area of the house. EVANS asked SA Watkins if he was interested

in purchasing some methamphetamine. SA Watkins said yes, but that he was unhappy with the

last four ounces he purchased and that he wanted it to come from the original supplier. EVANS

acknowledged that she understood his request.

Firearms Sale Involving Melissa Torres, Johnny Torres, and Donovan Torres

50.     SA Watkins and JOHNNY TORRES then engaged in conversation regarding the

purchase of firearms. JOHNNY TORRES told SA Watkins that he had a couple of firearms

inside the house. JOHNNY TORRES then walked to a different part of the house and returned a

couple minutes later with two firearms. SA Watkins identified one of the firearms as a short-

barreled rifle. JOHNNY TORRES told SA Watkins that the barrel had been cut off. SA Watkins

and JOHNNY TORRES negotiated prices for the firearms. TORRES advised SA Watkins that

he wanted $550.00 for both firearms. SA Watkins agreed on the price and paid TORRES

13

$560.00 of pre-recorded U.S. currency for the firearms.[4] TORRES accepted the money from SA Watkins.

51.	ATF agents identified the firearms as: (1) a Mossberg 500, 12-guage shotgun, serial number R667320, and (2) a short-barreled Ruger 10/22, 22 caliber rifle, serial number 11617182.

Meth Sale Involving Evans and Magana

52.	EVANS then walked into the room and told SA Watkins that the methamphetamine was on its way. EVANS asked SA Watkins how many ounces he wanted to purchase. SA Watkins told EVANS he wanted to purchase four ounces. EVANS acknowledged and walked away.

53.	At approximately 12:17 p.m., law enforcement surveillance observed the Cadillac Escalade, which had been parked at **4660 Ijams Street** a few minutes before, at the intersection of Ijams Street and Bianchi Street. Stockton Police Department Detective Villanueva conducted mobile surveillance on the Cadillac and saw that the driver was MAGANA.

54.	At approximately 12:20 p.m., Detective Villanueva saw MAGANA stop the Cadillac, exit the Cadillac, and enter a residence located at 1788 West Lane in Stockton, CA. MAGANA remained inside 1778 West Lane for approximately three minutes. At approximately 12:23 p.m., Detective Villanueva saw MAGANA walk out the front door of 1788 West Lane with his left hand in his front left pocket while talking on his cellular phone as he returned to the Cadillac. After entering the Cadillac, MAGANA sat in the driver's seat and continued to talk on the phone.

55.	At approximately 12:24 p.m., ATF SA Hollenback, conducting surveillance near **1217 N. Wilson Way**, observed EVANS standing under the front door frame of **1217 N. Wilson Way** talking on her cellular phone.

---

[4] SA Watkins paid TORRES $560.00 instead of $550.00 because SA Watkins did not have correct change.

14

56.     Meanwhile, law enforcement surveillance followed MAGANA's vehicle as MAGANA departed 1788 West Lane.  Surveillance watched MAGANA as he drove to **1217 N. Wilson Way**.

57.     At approximately 12:31 p.m., ATF SA Hollenback observed MAGANA arrive in front of **1217 N. Wilson Way** in his Cadillac.  ATF SA Hollenback saw EVANS approach the Cadillac and retrieve an unknown object from the passenger side of the vehicle.  EVANS returned to the residence and entered the front door.  The Cadillac remained parked in front of the house.

58.     At approximately 12:34 p.m., EVANS entered **1217 N. Wilson Way** and handed SA Watkins two clear plastic baggies containing suspected methamphetamine.  EVANS told SA Watkins that the price was $2,000.00 for the four ounces. SA Watkins agreed to the price and handed EVANS $2,000.00 in pre-recorded U.S. currency.  EVANS accepted the money.  SA Watkins asked EVANS if she was being compensated by the seller for arranging the transaction. EVANS stated, "Yeah he takes care of me."

59.     EVANS exited **1217 N. Wilson Way** with $2,000.00 in pre-recorded buy money and entered the passenger's seat of MAGANA's Cadillac.  MAGANA was sitting in the driver's seat. The Cadillac departed the area traveling southbound on N. Wilson Way.  A short time later, at approximately 12:38 p.m., Detective Villanueva saw the Cadillac, driven by MAGANA, stop beside the curb. Detective Villanueva saw EVANS exit the front passenger's seat.

60.     The suspected crystal methamphetamine purchased during this transaction was field tested, and the test confirmed a positive result for methamphetamine.

### MARCH 13, 2014 PURCHASE OF FOUR OUNCES OF METH

61.     On March 13, 2014, SA Watkins and TFO Hanker, both acting in an undercover capacity, traveled to **1217 N. Wilson Way** to conduct a previously scheduled transaction

involving the purchase of suspected crystal methamphetamine from Sally EVANS. Law enforcement surveillance units were located nearby to electronically monitor the transaction.

62.     At approximately 4:22 p.m., SA Watkins and TFO Hanker arrived at **1217 N. Wilson Way**. Upon arrival, SA Watkins and TFO Hanker made contact with MELISSA TORRES at the front door of the residence. MELISSA TORRES allowed SA Watkins and TFO Hanker to enter the house.

63.     At approximately 4:31 p.m., SA Keen observed an older model tan Ford Taurus pull up in front of the residence. SA Keen observed EVANS, who was the sole occupant in the vehicle, exit the car and enter into the residence. EVANS made contact with SA Watkins inside the house and told him that the methamphetamine was on its way.

64.     At approximately 4:36 p.m., SA Keen observed EVANS exit the residence. At approximately 4:37 p.m., SA Keen observed a maroon Chevrolet Sport Utility Vehicle bearing California license plate 5GDP111 pull up in front of the house. EVANS approached the passenger side of the vehicle and made contact with the occupants. SA Keen observed EVANS and the front seat passenger appear to make an exchange of an unknown item. EVANS then returned to the house. The Chevrolet SUV remained parked in front of the residence.

65.     EVANS and SA Watkins negotiated the transaction of methamphetamine. SA Watkins observed that the suspected methamphetamine was contained in a plastic bag. SA Watkins agreed to the price and handed EVANS $2,000.00 in pre-recorded U.S. currency. EVANS accepted the money. SA Watkins exited the residence with the suspected methamphetamine that he purchased from EVANS.

16

66.    EVANS exited the residence and again made contact with the occupants in the Chevrolet
SUV. After a couple of minutes, EVANS returned to the house and the Chevrolet SUV departed
the location traveling southbound on N. Wilson Way.

67.    The suspected crystal methamphetamine purchased during this transaction was field
tested, and the test confirmed a positive result for methamphetamine.

### MARCH 14, 2014 PURCHASE OF FOUR OUNCES OF METH

68.    On the night of March 13, 2014, SA Watkins called EVANS to order additional
methamphetamine. On the morning of March 14, 2014, EVANS and Watkins exchanged text
messages to confirm a meth sale later that morning. On March 14, 2014, SA Watkins and TFO
Hanker, both acting in an undercover capacity, traveled to **1217 N. Wilson Way** to conduct a
previously scheduled transaction involving the purchase of suspected crystal methamphetamine
from Sally EVANS. The Law enforcement surveillance units were located nearby to
electronically monitor the transaction.

69.    Law enforcement surveillance units were also set up in the vicinity of **4660 Ijams Street**
and confirmed that the white Cadillac Escalade bearing California license plate 7BRK878 was
parked in the driveway. At approximately 9:13 a.m., Stockton Police Department Detective
Pierce – conducting surveillance at **4660 Ijams Street** – observed the white Cadillac Escalade
depart **4660 Ijams Street** and travel straight to a residence located at **5345 Barbados Circle,
Stockton, CA** (the suspected stash house). Surveillance confirmed that MAGANA was the
driver. MAGANA exited the vehicle and made contact at **5345 Barbados Circle** with a Hispanic
male wearing a white t-shirt.

17

70.     This is the Cadillac that law enforcement had seen MAGANA drive on January 31, 2014 and February 11, 2014 and that law enforcement had seen parked in the driveway of **4660 Ijams Street** early in the morning on February 12, 2014, presumably overnight.

71.     At approximately 10:00 a.m., SA Watkins and TFO Hanker arrived at **1217 N. Wilson Way, Stockton, CA**. SA Watkins and TFO Hanker exited the vehicle and made contact with an unidentified Hispanic male at the front door. The unidentified Hispanic male allowed SA Watkins and TFO Hanker to enter the residence. This individual advised SA Watkins that EVANS was at work. An unidentified adult female inside the residence told SA Watkins that she would contact EVANS and let her know that SA Watkins and TFO Hanker were at the house.

72.     At approximately 10:02 a.m., surveillance units observed MAGANA depart from **5345 Barbados Circle** driving the Cadillac. Surveillance maintained constant mobile surveillance on MAGANA's Cadillac and followed it to the Whistle Stop bar and restaurant, located at 1105 N. Wilson Way. Based upon my investigations, I know that EVANS works at the Whistle Stop.

73.     At approximately 10:11 a.m., Stockton Police Department Detective Pope observed MAGANA exit the Cadillac and make contact with EVANS in front of the Whistle Stop. Detective Pope then observed MAGANA and EVANS enter the Whistle Stop together at approximately 10:12 a.m. A few minutes later, law enforcement surveillance observed MELISSA TORRES leave the Whistle Stop and enter the driver's seat of a tan Ford Taurus parked in the parking lot of the Whistle Stop.

74.     At approximately 10:16 a.m., SA Keen observed a Ford Taurus pull up in front of **1217 N. Wilson Way**. SA Keen observed MELISSA TORRES exit the vehicle and enter the residence, where she made contact with SA Watkins. SA Watkins observed that MELISSA

18

TORRES was in possession of a large zip lock baggie that contained a substance resembling crystal methamphetamine. SA Watkins and MELISSA TORRES negotiated the transaction of the four ounces of methamphetamine. SA Watkins agreed to the price and handed TORRES $2,000.00 in pre-recorded U.S. currency. TORRES accepted the money and departed the location.

75.     SA Watkins exited the residence with the suspected methamphetamine he purchased from MELISSA TORRES and departed the location.

76.     At approximately 10:36 a.m., SA Keen observed MELISSA TORRES exit the residence and enter the Ford Taurus. MELISSA TORRES departed the location traveling southbound on N. Wilson Way.

77.     At approximately 10:37 a.m., TFO Grinder observed Melissa TORRES arrive at the Whistle Stop in the same Ford Taurus. MELISSA TORRES exited the vehicle and entered the business. Surveillance observed that MAGANA's Cadillac was still parked outside the Whistle Stop and MAGANA was still inside.

78.     Based on my training, experience, and knowledge derived through previous investigations, I believe that **5345 Barbados Circle** is a stash house for MAGANA.  This belief is based on the fact that MAGANA drove directly to **5345 Barbados Circle** from his house at **4660 Ijams Street** on the morning of a drug deal, stayed at **5345 Barbados Circle** for only a few minutes, and then he drove directly to the Whistle Stop, where he met with his known drug dealing associate Sally EVANS a matter of minutes before TORRES left the Whistle Stop carrying methamphetamine sold to SA Watkins minutes later at **1217 N. Wilson Way**.

79.     The suspected crystal methamphetamine purchased during this transaction was field tested, and the test confirmed a positive result for methamphetamine.

# TRAINING AND EXPERIENCE REGARDING DRUG AND GUN TRAFFICKING AND TRAFFICKERS

80.     Based on my training and experience as an ATF Special Agent and from information I have received from other law enforcement officers who investigate firearms and narcotics trafficking, I know the following:

a.      Individuals who collect firearms for illegal distribution tend to stockpile multiple firearms in specific types and models that are popular with potential buyers, often gang members and drug traffickers. I know that these potential buyers frequently demand the following types of weapons: AK-47 type assault rifles, M-16/AR-15 type assault rifles, short barreled rifles/shotguns, and pistols of various calibers. By contrast, I know that individuals who collect firearms for sport or hobby tend to acquire only one of various types of firearms, as the goal is to increase the diversity of a collection, rather than maintain or stock inventory for sale.

b.      Illegal firearms dealers frequently stock their inventory of firearms under heavily guarded and secure conditions at locations under their control or custody, such as their residence, place of business, or another secure location like a storage facility, in order to protect their inventory and avoid police detection.

c.      People engaged in narcotics trafficking (hereinafter "subject offenses") commonly maintain personal property used or obtained in their subject offenses for extended periods of time, even long after the crime has been completed. The reasons these offenders maintain items of evidentiary value for extended periods of time include, but are not limited to: (1) the evidence may appear inconsequential in and of itself (i.e., receipts, personal calendars, telephone and/or address books, check books, various other financial

20

statements, utility records, ownership documents, letters and notes, telephone and pager

bills, keys to storage lockers, lock boxes, or other secure storage locations) but lends

significant relevance when considered with the totality of other evidence; (2) the offender

may not realize that he/she still possesses the evidence, and/or do not anticipate that law

enforcement officers will obtain a search warrant to seize such evidence; and (3) the

offender desires to maintain access to such items.

d.     People engaged in subject offenses commonly store records their activities in

attics, cabinets, safes, or other secured areas and/or containers on or within the premises

in which they reside or in motor vehicles that they drive.

e.     Persons engaged in the subject offenses usually possess in their homes, businesses

and/or vehicles, records or items that establish or document their control, possession,

custody or dominion over the structures and vehicles to be search and from which

evidence is seized, including, but not limited to: addressed envelopes, checkbooks,

personal identification, correspondence, utility bills, rent or payment receipts, financial

documents, keys, photographs, leases, mortgage bills, vehicle registration, ownership

warranties, receipts for vehicle parts and repairs, telephone answering machine

introductions and fingerprints.

f.     Based upon my experience and training, I have learned that drug traffickers often

place their assets in names other than their own to avoid detection of those assets by law

enforcement and the Internal Revenue Service; that those persons are commonly family

members, friends, and associates who accept title of assets to avoid discovery and

detection; that traffickers also often place assets in the ownership of corporate entities to

avoid detection by law enforcement agencies and although these assets are in other

individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. Typically traffickers keep records of those registrations and transactions in their residence.

g.     It is common for individuals involved in subject offenses to hide narcotics, proceeds derived from trafficking such contraband and records of their transactions in secure locations within their residences, vehicles and/or their businesses for their ready access and concealment from law enforcement. Individuals involved in subject offenses often maintain books, records, receipts, notes, ledgers and other documents related to the sale and distribution of such contraband.

h.     I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business. It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

i.     Persons involved in subject offenses to conceal their residences, vehicles, businesses, storage lockers, and safety deposit boxes caches of narcotics, to include ill-gotten proceeds in the form of currency, financial instruments, jewelry and other items of value. Traffickers maintain evidence of financial transactions related to obtaining, transferring secreting or spending large sums of money made from their criminal activities, including but not limited to, bank records, credit card records, records of large

purchases, receipts, canceled checks, wire transfers, wire transfer receipts, loan documents and pay/owe sheets, which refer to documents of records maintained for the purpose of managing money, often related to narcotics trafficking, paid and debts owed by certain individuals who are involved in or are the recipients of the distribution of such contraband.

h.      Individuals engaged in subject offenses commonly have on their person, at their residences, in their vehicles, and/or at their businesses, firearms and ammunition to protect their narcotics as well as currency derived from trafficking of such and from other individuals engaged in similar narcotics distribution who might attempt to rob or steal their contraband and/or currency.  These armed traffickers also possess and use said weapons to enforce the collection of debts owed and to intimidate others.

i.      Those individuals involved in subject offenses commonly use vehicles as storage containers for narcotics by those engaged in the distribution of narcotics. These vehicles are sometimes operable and registered to the suspect or to other persons, but are in the control of the suspect. Sometimes the vehicles are inoperable and/or abandoned within the curtilage of the property.  I know based on my training and experience that individuals engaged in the trafficking of narcotics commonly maintain keys for the aforementioned vehicles inside their residence to facilitate access to the vehicles.  I also know based on my training and experience that persons in control of a residence also accept and maintain considerable control over vehicles parked within the curtilage of the residence.

j.      In a search of an individual involved in subject offenses residence or vehicle, it is common to find documents revealing travel such as motel and hotel receipts, credit card

23

receipts, travel itineraries, maps and/or directions, and telephone bills. This is because such individuals often travel outside the community in which they reside to facilitate the procurement of the narcotics for which they distribute.

k.       In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution.  During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

l.       Individuals involved in the distribution of methamphetamine and other controlled substances often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their methamphetamine distribution, use, possession, or any other activities surrounding their methamphetamine trafficking activities, and that such items often identify co-conspirators in their methamphetamine trafficking activities.

m.       It has been my experience in the past that when suspects utilize mobile telephones to communicate with cooperating individuals or undercover agents to set up the methamphetamine and gun deals, records relating to these activities will be found stored in the cellular telephone.

n.       I know that narcotics and gun traffickers use mobile telephones to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they

and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.      During a search of a residence or vehicle maintained by an individual or individuals engaged in suspect offenses, it is common to locate and discover cellular telephones, pagers and personal digital communication devices, such as an iPhone, droid and/or blackberry used

25

by said individuals to arrange the distribution and transportation of firearms and narcotics.

o.      Based upon my experience and training, as well as information gathered from other law enforcement officers who have conducted drug trafficking investigations, I have learned that individuals trafficking illegal drugs typically store their product in another location and not their primary residence in order to avoid police detection. I have also learned from my training and experience, as well as information gathered from other law enforcement officers, that individuals trafficking illegal drugs typically conduct brief stops from their stash house where they conceal their product to the location where they are making the delivery in an effort to avoid police detection and possible robbery from rival drug dealers.

p.      While working as an ATF Special Agent, on multiple occasions I have utilized the Lexus Nexus Accurint for Law Enforcement database to establish, among other things, the residential address of potential law enforcement targets.  Based on my training and experience working with the database, I have found the Accurint for Law Enforcement database to be accurate and to reliably show the address and residential information of those listed in the database.

81.    As described above and in **Attachments A-1, A-2, and A-3**, this Affidavit seeks permission to search and seize things that are related to firearm and methamphetamine trafficking involving JOHNNY TORRES, DONOVAN TORRES, MELISSA TORRES, EVANS, and MAGANA, in whatever form such things are stored.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with

26

forensics tools. Similarly, things that have been viewed via the Internet are typically stored for
some period of time on the device. This information can sometimes be recovered with forensics
tools.

82.     It is my opinion, based on my training and experience, and the training and experience of
other law enforcement investigators to whom I have spoken, that the items listed in **Attachments
B-1, B-2, and B-3** are items most often associated with the distribution of controlled substances,
including methamphetamine, as well as the proceeds from such illegal operations.

83.     Based on my experience and training, and after consulting with other law enforcement
officers experienced in drug investigations, I know that individuals involved in drug dealing
often maintain at their residences, vehicles, and their persons the items described in
**Attachments B-1, B-2, and B-3**. Individuals involved in drug dealing also often maintain
paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled
substances. Therefore, I am requesting authority to seize all the items listed in **Attachments B-
1, B-2, and B-3** to this Affidavit and incorporated here by reference.

## CONCLUSION

84.     In this case, the facts set forth in this Affidavit demonstrate probable cause to believe that
the locations listed in **Attachments A-1, A-2, and A-3** to this Affidavit contain evidence of a
crime, contraband, fruits of a crime, and other items illegally possessed, property designed for
use, intended for use, or used in committing a crime, specifically, distribution of
methamphetamine and conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§
846 & 841(a)(1), and dealing firearms without a license, and conspiracy to distribute firearms
without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A) & 371.

85.     Specifically, I respectfully request authority to search:

27

a.  The current residence of EVANS and MELISSA TORRES, located at **1217 N. Wilson Way, Stockton, California** (described in detail in Attachment A-1);

b.  The current residence of MAGANA, located at **4660 Ijams Street, Stockton, California** (described in detail in Attachment A-2);

c.  The suspected "stash pad" of MAGANA located at **5345 Barbados Circle, Stockton, California** (described in detail in Attachment A-3);

d.  All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person; including, but not limited to the following:

   i.  A white Hyundai 4-door sedan with California license plate 6ZPB871, registered to Sally Elizabeth Evans at 546 E. Alpine Avenue, Stockton, California, 95204; and

   ii. A white Cadillac Escalade with California license plate 7BRK878, registered to Daniel Bennett at 340 Blain Avenue, Stockton, California, 95204.

86.  I further request that based upon this Affidavit, a criminal complaint and arrest warrants be issued for JOHNNY TORRES, DONOVAN TORRES, Sally EVANS, MELISSA TORRES, and Jorge MAGANA charging them with:

a.  JOHNNY TORRES with dealing firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A), and conspiracy, in violation of 18 U.S.C. § 371, on January 15, 2014 and February 20, 2014;

b.  DONOVAN TORRES with dealing firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A), and conspiracy, in violation of 18 U.S.C. § 371, on January 15, 2014, January 31, 2014, and February 13, 2014;

c.  Sally EVANS with conspiracy to distribute methamphetamine and distribution of at least 50 grams of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. §§ 846 & 841(a)(1), on February 11, 2014, February 13, 2014, February 20, 2014, March 13, 2014, and March 14, 2014;

d.  Melissa Monique TORRES with conspiracy to distribute methamphetamine and distribution of at least 50 grams of a mixture or substance containing

28

methamphetamine, in violation of 21 U.S.C. §§ 846 & 841(a)(1), on January 31, 2014, February 11, 2014, and March 14, 2014, and with conspiracy to deal firearms without a license, in violation of 18 U.S.C. § 371, on January 15, 2014; and

g.   Jorge MAGANA with conspiracy to distribute methamphetamine and distribution of at least 50 grams of a mixture or substance containing methamphetamine, in violation of in violation of 21 U.S.C. §§ 846 & 841(a)(1), on January 31, 2014, February 11, 2014, February 20, 2014, and March 14, 2014.

I declare under penalties of perjury that the statements above are true and accurate to the best of

my knowledge and belief.

Special Agent Thomas Keen
Bureau of Alcohol, Tobacco, Firearms
and Explosives

Sworn to and subscribed before
me on the **17th** day of March, 2014

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

Christiaan Highsmith
Assistant U.S. Attorney